IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2009 FEB 10 PM 2:59

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
                DEPUTY

| | | |
|---|---|---|
| BRUECHER FOUNDATION SERVICES, INC., | § § § | |
| PLAINTIFF, | § § | |
| V. | § § | CAUSE NO. A-06-CA-376-LY |
| UNITED STATES OF AMERICA, | § § | |
| DEFENDANT. | § § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BE IT REMEMBERED that on December 17, 2007, the Court called the above-styled cause

for bench trial, concluding on December 18, 2007. Plaintiff Bruecher Foundation Services, Inc.

(Bruecher Foundation) appeared through its authorized representative William Howie Bruecher and

by counsel. Defendant United States of America appeared by counsel. Bruecher Foundation, a

foundation-repair company, brings this action seeking a refund of employment taxes paid to the

Internal Revenue Service (IRS).[1] The IRS counterclaimed for unpaid employment taxes for all

quarters of 1999 and 2000, and unemployment taxes for tax years 1999 and 2000. Having carefully

considered the evidence presented at trial, the arguments of counsel, the parties' stipulated facts, the

parties' post-trial submissions, the applicable law, and the record in this cause, the Court concludes

that the IRS properly classified Bruecher Foundation's workers as employees for the tax years 1999

---

[1] For clarity, the Court will refer to Defendant United States of America as the Internal Revenue Service or IRS, the agency of which Bruecher Foundation complains.

and 2000 and will order Bruecher Foundation to pay the assessed taxes. In so concluding, the Court makes the following findings of fact and conclusions of law.[2]

### *Jurisdiction and Venue*

The Court has jurisdiction of this action because it is a "civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected . . . ." 28 U.S.C. § 1346. Venue is proper in the Western District of Texas because Bruecher Foundation is based in Austin, Texas, and therefore a substantial part of the events or omissions giving rise to the claims occurred in the Western District of Texas. *See* 28 U.S.C. §§ 1391(e), 1402(a)(1).

### *Findings of Fact[3]*

Procedural Facts

On or about July 2, 2003, the District Director of Internal Revenue in Austin, Texas, mailed a Summary of Employment Tax Examination to Bruecher Foundation, which set forth proposed examination changes reclassifying Bruecher Foundation's labor from contractor to employee. This summary was transmitted with a Form 2504-WC, Agreement to Assessment and Collection of Additional Tax and Acceptance of Overassessment in Worker Classification Cases. Bruecher Foundation never agreed to the assessment and has challenged it throughout these proceedings. The proposed assessments were made for a total of sixteen workers in 1999 (five unknown and described

---

[2] All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed. Likewise, any conclusion of law more appropriately considered a finding of fact shall be so deemed.

[3] On December 17, 2007, the Court approved and accepted the parties' Joint Stipulation of Facts filed December 14, 2007 (Clerk's Document 59). The Court incorporates such stipulated facts in its findings and conclusions as appropriate.

as "?", "new employee", "Marcelino", "new guy", and "other guy") and thirteen workers in 2000. The IRS did not perform an on-site audit, interview Bruecher Foundation's president, or interview Bruecher Foundation's office staff. IRS examiner Mike Woydziak did not provide Bruecher Foundation with a written notice of the provisions of Section 530, the safe-harbor statute, before or at the beginning of the audit inquiry relating to employment status of Bruecher Foundation's workers. *See* Revenue Act of 1978, Pub. L. No. 95-600, 92 Stat. 2763, 2885-86, § 530(a)(1) (reproduced at 26 U.S.C. § 3401 note).

On December 9, 2004, the IRS transmitted its Notice of Determination of Worker Classification to Bruecher Foundation. On June 6, 2005, the IRS assessed additional employment taxes, penalties, and interest against Bruecher Foundation for each of the quarters in the tax years 1999 and 2000. These taxes included the Employer's Quarterly Federal Tax Returns (Forms 941) and the Employer's Annual Federal Unemployment Tax Returns (Forms 940). *See* 26 U.S.C. §§ 3101, 3111, 3301, 3402, 3509. Following the assessment and determination of worker classification, and in accordance with the divisible tax rule, Bruecher Foundation paid the tax for each of eight assessments for one employee, and seven assessments for another employee, for both tax years and all quarters of 1999 and 2000. *See Flora v. United States*, 362 U.S. 145, 171 n.37 (1960).

Bruecher Foundation immediately sought a refund of the $1385.74 so remitted. On July 1, 2005, Bruecher Foundation filed Claims for a Refund and Request for Abatement via Forms 843. On July 6, 2005, the IRS returned Bruecher Foundation's Forms 843 on the ground that such was

an improper administrative appeal because "the tax was assessed after a fully agreed to examination audit."[4]  The IRS was in error; there was no agreement.

On August 8, 2005, the IRS informed Bruecher Foundation by letter that it had not resolved the reclassification matter and needed sixty days to complete its research.  On August 22, 2005, the IRS transmitted a letter to the same effect.  On or about December 13, 2005, the IRS transmitted to Bruecher Foundation a Notice of Federal Tax Lien Filing.  Bruecher Foundation filed this lawsuit on May 19, 2006, seeking a refund of the $1385.74 tendered pursuant to its 843 filings, $10,637.71 levied on Bruecher Foundation's Wells Fargo bank account on or about March 23, 2006, attorney's fees, and an order abating and voiding the balance of the IRS assessments for both tax years.  On July 29, 2007, the IRS counterclaimed for the $59,888.63 assessment it alleges Bruecher Foundation has failed to pay, plus interest and all statutory additions provided by law, less credit for any payments and set offs (Clerk's Document 23).

Taxpayer Facts:

Bruecher Foundation is a corporation that specializes in home-foundation repair.  William Bruecher is the president and sole shareholder of Bruecher Foundation.  Bruecher, as the company president, and one office secretary were the only workers Bruecher Foundation carried on the payroll as employees in 1999 and 2000.  Bruecher Foundation contends that, during 1999 and 2000, the rest of its workers were independent contractors and not employees.  Bruecher Foundation did not withhold income, Federal Insurance Contributions Act (FICA), or Federal Unemployment Tax Act

---

[4] Although the parties stipulated that the IRS returned Bruecher Foundation's Forms 843 on July 6, 2005, the relevant IRS letter is dated September 6, 2005.

4

(FUTA) taxes from such workers' wages. Bruecher Foundation did not provide them with Forms 1099 or file the Forms 1099 until May 2006.

Bruecher Foundation paid the workers an hourly wage ranging from $5.50 to $9 per hour and Bruecher kept track of the hours worked.[5] Bruecher Foundation did not provide any benefits such as vacation pay or sick leave. Bruecher Foundation had a verbal contract with the workers, and the workers could not profit from their work other than receiving their hourly wage. Workers had the right to end their relationship with Bruecher Foundation at any time they wished.

Bruecher fielded calls from prospective clients and spent much of his days traveling from one potential job to another. At each initial visit, Bruecher devised a cure to a foundation problem, estimated the cost of the work needed, and submitted a bid to a prospective client. Certain types of foundation-repair jobs required a permit from the city, which generally cost between $50 and $75. Bruecher secured such a permit if necessary.

Bruecher Foundation's business facilities consist of an approximately 1000 square-foot office on a quarter acre with an 1800-square-foot pole barn behind it for storage. To work with Bruecher Foundation on a specific day, workers arrived at the grounds surrounding Bruecher Foundation's office between 7:00 a.m. and 7:30 a.m. When a crew of workers was going to begin a new job, Bruecher led it to the job site in Bruecher Foundation trucks. In 1999 and 2000, Bruecher Foundation had four trucks, two of which displayed Bruecher Foundation's name and telephone number on their sides. On any given day, Bruecher Foundation would typically have workers present at up to three job sites.

---

[5] Although the parties stipulated to these amounts, trial testimony revealed that at least one worker mase $11.50 per hour, and that crew leaders may have monitored and report the workers' hours to Bruecher.

Bruecher generally left a work site after everything was laid out and he had talked to the customer to answer any questions or concerns. No supervisor remained on the job to oversee the workers. At the end of a job, Bruecher returned to assure the job had been performed properly, the work site was clean, and the customer was happy so that the job was ready to be billed. If a problem arose at a job site, workers would wait for Bruecher to arrive, review the job, and solve the problem.

Bruecher Foundation provided all tools, equipment, and materials necessary for completion of a foundation-repair job, and all costs were Bruecher Foundation's responsibility. The only equipment needed to dig holes at a foundation-repair job was a shovel and sharpshooter, or a long spade.

To repair a slab foundation, workers installed hydraulically driven piers underneath the affected area of a foundation in order to lift the structure. Upon arriving at a new job site with the workers, Bruecher marked the specific spots where piers were needed. The piers were spaced approximately seven to eight feet apart. To install the piers, workers dug a hole approximately two-and-one-half feet square. A worker set a precast concrete cylinder in the bottom of the hole. The worker placed a 25-ton hydraulic ram jack on top of the cylinder, which was connected to a 10,000-psi Port-a-Power unit. The ram jack was driven up against the bottom of the foundation and pressed that pile section into the ground. The hydraulic ram jacks used on the jobs were owned by Bruecher Foundation. During 1999 and 2000, Bruecher Foundation owned three or four ram jacks, which each retailed for about $500 to $600. Ram jacks can be dangerous is not used properly, so ram-jack operators had to know what they were doing to operate them safely. Bruecher Foundation also owned two Port-a-Power units, or hydraulic pumps, which each retailed for about $2000.

6

In a pier-and-beam foundation, a house sits on cedar posts or on a "block and base." A block and base is a sixteen-by-sixteen-by-four-inch thick pad sitting on the ground with cinder blocks stacked on top of it. Repair of a pier-and-beam foundation involves removing either the old posts or the block and base and installing a "concrete-spread footing pier." Bruecher inspected the beams to determine which were defective and needed to be replaced. To install the concrete-spread footing pier, workers dug a two-foot by two-foot hole in the ground. Workers laid down a mat of steel rebar in the hole and poured a pad of concrete, which was used to support the piers. To level the structure, a 20-ton hand jack, provided by Bruecher Foundation, was placed on top of the pads. The 20-ton hand jacks used to level pier-and-beam foundations cost $100 each.

The workers could not perform the final leveling stage without Bruecher present. During leveling, Bruecher shot an elevation inside the house, which involved using a leveling device to determine the elevations across the structure's floor to ascertain what was necessary to straighten the foundation. After a foundation was leveled, workers tied the steel with number-3 stirrups on twelve-inch centers, cut a Sonotube and placed it on top of the pad, and filled the Sonotube with concrete. After the concrete cured, workers cut off the tubes and constructed a stucco skirt or underpinning around the house's crawl space.

Bruecher Foundation also worked on grading and landscaping projects, including building retaining walls. Bruecher directed workers where to construct retaining walls, and the workers constructed the walls. Constructing retaining walls included burying railroad ties or other anchoring devices within the terrain to hold the wall in place. Constructing the retaining walls required experience and skill because workers calculated the weight of the dirt as though it was fully saturated and accounted for such weight in designing and constructing the walls.

*Conclusions of Law*

Employment-Tax Law, Burden of Proof, and the Common-Law Test

The federal tax system subjects employers and employees to various employment taxes. The Federal Insurance Contributions Act provides for a tax on employees and employers, and requires an employer to deduct the amount of the taxes from employees' wages as and when paid. 26 U.S.C. §§ 3101-3111. The Federal Unemployment Tax Act imposes an annual unemployment tax on every employer of a certain percentage of total wages paid. *Id.* § 3301. Additionally, an employer must withhold income tax from wages it pays employees. *Id.* § 3402.

An IRS tax assessment is presumed to be valid. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Affiliated Foods, Inc. v. Commissioner of Internal Revenue*, 154 F.3d 527, 530 (5th Cir. 1998). In seeking a refund, a taxpayer must overcome the presumption of validity and prove the dollar amount of the refund it claims. *Portillo v. Commissioner of Internal Revenue*, 932 F.2d 1128, 1133 (5th Cir. 1991); *Sara Lee Corp. v. United States*, 29 Fed.Cl. 330, 334 (Fed. Cl. 1993). "The burden and the presumption, which are for the most part but the opposite sides of a single coin, combine to require the taxpayer always to prove by a preponderance of the evidence that the [IRS's] determination was erroneous. This burden applies . . . [when] the proceeding . . . is in . . . district court upon a refund claim or a government counterclaim." *Carson v. United States*, 560 F.2d 693, 695-96 (5th Cir. 1977); *see United States v. Janis*, 428 U.S. 433, 440 (1976).

The Court presumes that the IRS's tax assessment of $59,888.63 against Bruecher Foundation is valid, and it is Bruecher Foundation's burden to prove the assessment is erroneous.

8

In the context of this worker-classification suit, Bruecher Foundation must therefore prove by a preponderance of the evidence that its workers were independent contractors, not employees.[6]

An employee is "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 U.S.C. §§ 3121(d)(2), 3306(i); *Breaux & Daigle, Inc. v. United States*, 900 F.2d 49, 51 (5th Cir. 1990). "Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee." 26 C.F.R. §§ 31.3121(d)-1(c)(1), 3306(i) (2008). If an employer-employee relationship exists, the parties' description of the relationship as anything else, such as an independent contractor, is immaterial. *Id.* § 31.3121(d)-1(a)(3).

Because the Social Security Act operates uniformly throughout the United States, courts apply federal common-law rules, not state law, to determine whether a worker has the status of an employee. *American Oil Co. v. Fly*, 135 F.2d 491, 493 (5th Cir. 1945); *see also Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989); *Texas Carbonate Co. v. Phinney*, 307 F.2d 289, 292 (5th Cir. 1962). Such rules describe the "conventional master-servant relationship as

---

[6] In its post-trial briefing to the Court, Bruecher Foundation argues that the IRS's failure to provide it with Section 530 safe-harbor notice shifts the burden of proof regarding the common-law factors to the IRS. As the Court noted in its May 3, 2007 Memorandum Opinion and Order Denying Plaintiff's Motion for Partial Summary Judgment (Clerk's Document 21), the burden of proof shifts from the taxpayer to the IRS for purposes of safe-harbor relief, if "a taxpayer establishes a prima facie case that it was reasonable not to treat an individual as an employee for purposes of [Section 530], and the taxpayer has fully cooperated with reasonable requests from the Secretary of the Treasury or his delegate . . . ." Small Business Job Protection Act of 1996, Pub. L. No. 104-188, sec. 1122(a), 110 Stat. 1755, 1766 § 530(e)(1) (reproduced at 26 U.S.C. § 3401 note). Shifting burdens for purposes of proving entitlement to safe-harbor relief have no bearing on Bruecher Foundation's burden to overcome the presumption that the IRS's tax assessment against it is correct. The Court has already determined that Bruecher Foundation is not entitled to safe-harbor protection.

understood by common-law agency doctrine." *Reid*, 490 U.S. at 740. Congress intended that courts,

in determining employer-employee relationships, follow the "body of decisional law defining [such]

relationships in various occupations." *United States v. Webb*, 397 U.S. 179, 188 (1969). Federal

common-law factors apply in determining employer-employee relationships under a variety of

statutory schemes. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992) (ERISA);

*Reid*, 490 U.S. at 740 (copyright); *Webb*, 397 U.S. at 180, 188 (employment taxes).

> Generally [an employee-employer] relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done.

*Webb*, 397 U.S. at 189; *Breaux and Daigle*, 900 F.2d at 51; 26 C.F.R. § 31.3121 (d)-1(c)(2). Further,

> [i]n determining whether a hired party is an employee under the general common law of agency, [a court] consider[s] the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323-24.

The Fifth Circuit uses similar and overlapping factors to determine a worker's status for

employment-tax purposes: the "degree of control, opportunities for profit or loss, investment in

facilities, permanency of relation, and skill required in the claimed independent operation." *Breaux*

10

*and Daigle*, 900 F.2d at 51 (citing *Silk v. United States*, 331 U.S. 704, 716 (1947)).[7] Among the

common-law factors, the right to control workers is a primary factor in determining workers' status.

*Webb*, 397 U.S. at 192.

The IRS has distilled twenty factors from examination of case law and IRS rulings to aid in

determining whether sufficient control exists in the relationship such that it is an employer-employee

relationship. Rev. Rul. 87-41, 1987-1 C.B. 296 (cited in *Darden*, 503 U.S. 323-24). The factors are:

(1) how much instruction is given to the worker; (2) how much training is involved in the person's

work; (3) whether the worker's services are integrated into the business operations; (4) whether a

worker must render services personally; (5) whether the hirer hires, supervises, and pays assistants

in a way that indicates control; (6) whether a continuing relationship exists; (7) whether the worker

must work set hours; (8) whether the worker must work full time; (9) whether the worker works on

the employer's premises; (10) whether the worker must perform services in a set order or sequence;

(11) whether the worker must submit oral or written reports; (12) whether the worker is payed by the

hour, week, or month, as opposed to by the job or on straight commission; (13) whether the person

for whom services are performed pays the worker's business and/or traveling expenses; (14) whether

the person for whom services are performed furnishes tools and materials; (15) whether the worker

makes a significant investment in facilities; (16) whether the worker can realize profit or loss as a

---

[7] The *Silk* court, in addition to considering some aspects of the traditional agency common-law test, based its holding on "accomplish[ing] the purposes of the [Social Security] legislation," and construing the term "employee" "in light of the mischief to be corrected and the end to be attained." *Silk*, 331 U.S. at 712-713. The Supreme Court has since departed from *Silk's* analysis to the extent it diverges from the common-law agency test. *Darden*, 503 U.S. 325; *Webb*, 397 U.S. at 185-186 (discussing House and Senate joint resolution enacted to clarify Congress's intent as to employer-employee law in federal tax-law cases, *see* H.R.J. Res. 296, 80th Cong. (1948) (enacted)); *Breaux & Daigle*, 900 F.2d at 52, n.3. In these findings and conclusions, the Court only analyzes factors from *Silk* that relate to the traditional common-law tests.

result of his services; (17) whether the worker works for more than one firm at a time; (18) whether the worker makes his services available to the general public; (19) whether the person in charge has a right to discharge the worker; and (20) whether the worker has a right to terminate his relationship with the person for whom services are performed. *Id.*

Although "[n]o hard and fast rule can be stated for determining whether a particular relationship is one of employer and employee or contractee and independent contractor, the nature of the relationship is a question of fact to be determined from the facts of the particular case." *Texas Carbonate Co.*, 307 F.2d at 292; *see* 26 C.F.R. § 31.3121(d)-1(c)(3). If the determination between employee and independent contractor is a close one, doubts should be resolved in favor of employment. *Texas Carbonate*, 307 F.2d at 292. The Court considers the relevant factors listed by *Darden*, the Fifth Circuit, and the IRS, many of which overlap. *See Darden*, 503 U.S. at 323-24; *Breaux & Daigle*, 900 F.2d at 51; Rev. Rul. 87-41, 1987-1 C.B. 296.

Application

*Independent-Contractor Factors*

The following facts and analysis weigh in favor of a finding that Bruecher Foundation's workers were independent contractors in 1999 and 2000. Bruecher Foundation did not officially provide training to its workers; workers new to the foundation business learned the trade on-site from coworkers. Workers did not always come to work in the morning and they did not always call Bruecher to alert him to their absence. Workers worked for varying periods of time, and no evidence shows Bruecher Foundation ever penalized workers for not showing up in the morning, or for leaving for periods of time. Some workers did not have permanent or continuing relationships with Bruecher Foundation. As workers did not have to give notice that they did not plan to work on a

12

specific day, it was not important that workers render services personally. While the workers were on a job site, they were free to determine when to take breaks or when to eat lunch. For most of the day, Bruecher did not supervise workers' activities, and workers were able to follow their own pattern of work throughout the day. Bruecher Foundation did not provide employee benefits such as sick leave or vacation pay. Performing certain aspects of Bruecher Foundation's work involved skill, such as experience with and knowledge of ram-jack safety, and understanding the proper positioning and methodology for constructing retaining walls. Workers sometimes brought new workers with them to join the work crews. Although Bruecher Foundation did not file 1099 forms for its 1999 and 2000 workers until May 2006, its position is that it treated its workers as independent contractors in 1999 and 2000, and such treatment is common in the industry.

### *Employee Factors*

The following facts and conclusions weigh in favor of a finding that Bruecher Foundation's workers were employees. Bruecher Foundation had the right to instruct workers when, where, and how to work, and to some extent mandated the sequence of work. Specifically, Bruecher told the workers when to work at certain job sites, showed workers where the jobs were located, flagged the jobs, left the workers to progress at the job, and returned for the final leveling. Although Bruecher was not physically present during most of the work day, testimony revealed that he stopped by occasionally. If workers left a job site in disarray, Bruecher instructed them to stay or return to clean it and often paid workers for that time. Bruecher Foundation assigned additional projects to workers when one job ended and another began.

Although workers occasionally brought new crew members with them to work and suggested that Bruecher Foundation hire them, Bruecher Foundation did the hiring and paid the workers. A

13

continuing relationship existed between Bruecher Foundation and certain workers. Workers worked full time for Bruecher Foundation, usually from 7:00 a.m. to 5:00 p.m., and no evidence indicated that the workers had discretion to modify this schedule. Bruecher Foundation paid workers by the hour at the end of the week, even if the job was not completed. No evidence indicated that hourly payment was the most convenient way to pay for what otherwise would have been a lump sum agreed to before a crew began a job.

Bruecher Foundation transported workers to and from job sites in its trucks. Bruecher Foundation provided all the tools and equipment necessary for the workers to perform a foundation-repair job. If a work crew needed supplies, Bruecher directed workers to purchase supplies at the store and paid for the supplies. Bruecher testified that equipment and tools for a foundation-repair job cost between $3000 and $3500, and that the profit from one foundation-repair job could pay for the necessary equipment and tools. Such initial investment was not *de minimis,* and no evidence showed workers possessed their own equipment and tools. The workers did not invest in facilities; Bruecher Foundation maintained the yard where the workday began. The workers could not profit or suffer a loss from their work with Bruecher Foundation. Bruecher Foundation would have been liable for any damage caused by workers, and Bruecher Foundation provided the warranty to homeowners.

When they worked for Bruecher Foundation, workers did not offer their services to the public or run their own foundation-repair companies. No evidence showed that any Bruecher Foundation workers ever bid for or completed foundation-repair projects of their own. While workers worked for Bruecher Foundation, they did not work for others. Bruecher testified he could discharge a worker for not performing his work properly. Workers were free to terminate their relationship with

14

Bruecher Foundation at any time, and often did. Although skill was required for some aspects of the job, such as operating ram jacks and designing retaining walls, evidence also showed that some workers possessed no relevant skills when they began work with Bruecher Foundation.

The Court's analysis of the common-law factors indicates Bruecher Foundation retained a significant level of control over its workers' schedules and ability to perform foundation-repair jobs, and where it did not exercise such control, it retained the right to do so. "Though [Bruecher Foundation] did not control the intimate details of the [workers'] work, the degree of control necessary for a particular endeavor is of necessity commensurate with the nature of that task." *Breaux & Daigle*, 900 F.2d at 52. Because one of the workers' major tasks was digging holes below foundations, unskilled workers were able to work for Bruecher Foundation alongside more skilled workers. Even the skilled workers would not have been able to complete their work without the transportation, equipment, and tools provided by Bruecher Foundation. Bruecher Foundation bore the risk of loss attendant to its business, and its workers bore no such burden nor invested in facilities, tools, or equipment. After considering the record in this cause, weighing all of the factors, and remaining mindful that doubtful questions should be resolved in favor of employment, the Court finds and concludes that Bruecher Foundation has not proved by a preponderance of the evidence that its workers were not employees.

**IT IS THEREFORE ORDERED** that Bruecher Foundation **TAKE NOTHING** by its claim against the IRS.

**IT IS FURTHER ORDERED** that the IRS prevails on its counterclaim against Bruecher Foundation for unpaid income taxes and taxes under the Federal Insurance Contributions Act and Federal Unemployment Tax Act for tax years 1999 and 2000.

15

**IT IS FURTHER ORDERED** that Bruecher Foundation shall pay to the IRS $59,888.63, plus interest and all statutory additions provided by law, less credit for any payments and set offs.

**IT IS FINALLY ORDERED** that the parties shall provide this Court with an accounting of all prejudgment interest, statutory additions, credits, and set offs no later than February 24, 2009, upon receipt of which the Court will render judgment consistent with these findings and conclusions.

SIGNED this **10th** day of February, 2009.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE